UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60992-SMITH/REID

SANDRA FRONDEK,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security
Administration,

      Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The cause is before the Court upon Plaintiff Sandra Frondek's Motion for Summary Judgment [ECF No. 18] and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment [ECF No. 20]. For the reasons stated below, the Undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and the Administrative Law Judge's ("ALJ") decision be **AFFIRMED**.

## BACKGROUND

Plaintiff appeals a partially favorable decision that granted her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), finding her disabled. Plaintiff had protectively filed her applications on October 4, 2018, alleging a disability onset date of August 31, 2017. [ECF No. 18 at 1]. Plaintiff alleges she suffers from depression, anxiety, fibromyalgia, osteoarthritis, hypothyroidism, sleep apnea, hypercholesterolemia, bursitis in her right hip, a herniated disc in the lower back, and post-traumatic stress disorder ("PTSD"). [ECF

1

No. 1 at 2]. Her claim was initially denied on October 4, 2018, and the Appeals Council denied hearing Plaintiff's request for review. [ECF No. 18 at 2]. Plaintiff then filed a written request for a hearing before ALJ Mary Brennan which was granted. [ECF No. 12 at 21].

On January 2, 2020, Plaintiff and her counsel, Samantha Yero, attended a live hearing held before the ALJ. [*Id.* at 43]. Also in attendance was Jeffery Barrett, an impartial vocational expert ("VE"), who participated in the hearing where he listed possible jobs suitable for Plaintiff's conditions. [*Id.* at 65].

After the hearing and upon review of the record, the ALJ agreed that Plaintiff was disabled, but found her disability onset date was May 2, 2019, rather than August 31, 2017, thus denying her claim for the approximately two-year prior time-period. [*Id.* at 36]. Plaintiff contends that was error.

 Specifically, the ALJ concluded that Plaintiff:

(1)  met the insured status requirements of the Social Security Act through December 31, 2022.

(2)  did not engage in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)  has had the following severe impairments since the alleged onset date of disability, August 31, 2017: major depressive disorder, post-traumatic stress disorder ("PTSD"), anxiety, fibromyalgia, polyarthralgia, right hip bursitis, mild ulnar and median neuropathy, status-post right knee fracture and history of meniscal tear (20 CFR 404.1520(c) and 416.920(c)).

(4)  since August 31, 2017, has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)  held the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with certain exceptions.

(6)  since August 31, 2017, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)  was an individual closely approaching advanced age. On May 2, 2019, when Plaintiff became 55 years old, her age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

(8)  has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)  has not been able to transfer job skills to other occupations.

(10)  could work jobs that existed in significant numbers in the national economy that the claimant could have performed prior to May 2, 2019.

(11)  could not perform a significant number of jobs in the national economy considering her age, education, work experience, and residual functional capacity after May 2, 2019.

(12) was not disabled prior to May 2, 2019, but became disabled on that date and has continued to be disabled through the date of this decision.

[*Id.* at 24–36].

The Appeals Council denied hearing Plaintiff's request for review. [*Id.* at 36].  Plaintiff then sought judicial relief and initiated the instant action. [ECF No. 1 at 1–2]. Plaintiff's claim of error centers around her contention that the ALJ failed to apply the correct legal standards to evaluate the medical opinion written by Dr. Dahlia V. Gordon, Psy.D, Plaintiff's psychological consultative examiner. [ECF No. 18 at 7]. Specifically, Plaintiff argues the ALJ erred by not explicitly discussing the factors of "supportability" and "consistency" when evaluating Dr.

3

Gordon's reports considering the updated SSI procedure in 20 C.F.R. § 404.1520c(b)(2). [*Id.*]. Therefore, according to Plaintiff, a disability onset date after May 2, 2019, was improper. [*Id.* at 1].

### RELEVANT MEDICAL EVIDENCE

In her written Decision, the ALJ reviewed and weighed the medical evidence presented starting with the evidence of Plaintiff's physical impairments and then her mental impairments. [ECF No. 12 at 21]. She noted that Plaintiff's medical treatment for her physical impairments contained "significant gaps" in that she had suffered a knee injury in 2017 but had not received ongoing treatment. [ECF No. 12 at 27]. Plaintiff's medical records are briefly reviewed here.

**(1) Dr. Kenneth Stein, M.D. Diagnostic Professionals, INC.**

On referral from Dr. Kephart [*supra* at 270], Plaintiff had a magnetic resonance imaging ("MRI") of her right knee without contrast. [*Id.* at 276.]  On June 12, 2017, Dr. Stein, who reported the findings, stated there was a small joint effusion without a Baker's cyst and mild soft tissue swelling around the knee. [*Id.*]. There was also an oblique tear involving the posterior horn and midbody of the medial meniscus with a small meniscal cyst. [*Id.*]. Dr. Stein's final impression stated: "(1) an incomplete fracture involving the posterior central lateral tibial plateau with a nondisplaced fracture of the fibular head. [*Id.*]. Marrow edema involving the posterior superior no weight-bearing lateral femoral condyle may be additional contusion/incomplete fracture or could be degenerative; (2) linear oblique tear posterior horn and midbody of the medial meniscus with small associated meniscal cyst projecting the midbody medially; (3) grade 1-2 strain of the medial collateral ligament; (4) mild degenerative changes medial knee compartment; (5) and small joint effusion with soft-tissue swelling around the knee, greatest anterior medially." [*Id.*].

### (2) Dr. Curtis J. Kephart, M.D., Golden Orthopedic Knee and Sports Medicine Center

On June 13, 2017, Plaintiff saw Dr. Kephart for pain in her right knee after she slipped and fell while exiting her RV. [*Id.* at 273, 337.]. Dr. Kephart reviewed an MRI of the knee, which he referred to Diagnostic Professionals. [*Id.* at 270, 276]. Dr. Kephart noted "improvements in swelling and pain." [*Id.* at 270]. Plaintiff appeared pleasant, well nourished, well developed, and in no acute distress. [*Id.*]. Further, Plaintiff showed no signs of deformity, swelling, ecchymosis, or trace effusion. [*Id.*]. Additionally, Dr. Kephart found no scars, wounds, or cuts on her skin. [*Id.*]. Lastly, Dr. Kephart recommended that Plaintiff follow up in four weeks and continue low-impact exercise programs, nonsteroidal anti-inflammatory drugs ("NSAID"), and icing. [*Id.* at 271].

### (3) Dr. Albert Abrams, M.S.

Dr. Abrams was Plaintiff's rheumatologist in Pennsylvania where she visited his office to treat her muscle spasms and trochanteric bursitis on November 30, 2017. [ECF No. 12 at 337.]. Dr. Abram's treatment notes indicated Plaintiff had "not been seen in over a year." [*Id.*]. He wrote further that Plaintiff told him that her life has "fallen apart." [*Id.*]. Since coming back to Pennsylvania to visit her family, Plaintiff cannot "stand to be around people." [*Id.*]. However, when Plaintiff is in Florida, she has a better lifestyle. [*Id.*]. Significantly, the joint pain in her hip, ankle, and back was "reportedly only mild-moderate." [*Id.* at 28].

Considering her physical ailments, Dr. Abrams noted that Plaintiff slipped while exiting her RV "when her left foot went completely out from underneath her" in June 2017. [*Id.* at 337]. Dr. Abrams reported that the MRI, which was referred to Golden Orthopedics [*Id.* at 270], showed "[three] bones behind the knee that were fractured, and the medial meniscus was torn." [*Id.* at 337.]. Plaintiff also had tenderness of the interscapular region, over the right trochanteric bursa,

the episacral area of the low back, and pain in the C1-2 areas of the neck. [*Id.* at 341]. Dr. Abrams posited that the knee improved despite occasional tenderness. [*Id.* at 337].

Overall, Dr. Abrams was of the opinion that Plaintiff "was able to dress (with some difficulty), get in and out of bed (with some difficulty), lift a glass to her mouth, wash and dry herself (with some difficulty), bend down to pick up clothing from the floor (with some difficulty), turn regular facets on and off; get in and out of a car, bus train, or airplane (with some difficulty), walk two miles (with some difficulty), and participate in recreational activities and sports (with much difficulty)." [*Id.* at 339]. The fall from the RV left Plaintiff in a leg brace for three months and she took up aquatherapy to help mediate the pain. [*Id.* at 337].

Plaintiff then saw Dr. Abrams for another physical examination about a year later, on September 25, 2018. [*Id.* at 360]. At that examination, Dr. Abrams noted 18/18 trigger points for fibromyalgia but equally emphasized that Plaintiff had good right hip movement. [*Id.* at 363]. Around a month after that, on October 15, 2018, Plaintiff received an injection in her shoulder, hip, knee, and sacroiliac joints. [*Id.* at 28, 366]. Plaintiff saw Dr. Abrams again on October 31, 2018, because of her continuous pain. [*Id.* at 371] Despite the aliments, Dr. Abrams found her musculoskeletal examination "within normal limits" and prescribed Meloxicam, Carbamazepine, and Gabapentin. [*Id.* at 373]. In September 2019, Dr. Abrams, once more, administered an injection in the large joints of the claimant's shoulder, hip, and knee to treat osteoarthritis. [*Id.* at 464].

**(4) Heather Calhoun, PA-C, Primary Care Associates of W. PA**

Plaintiff visited physician assistant Dr. Calhoun in Western Pennsylvania on April 11, 2018. [*Id.* at 346]. There, Plaintiff stated she suffers from anxiety issues related to recent events with her nephew. [*Id.*]. She was taking Ativan to help with her anxiety as well as Wellbutrin,

Cymbalta, Trazadone. [*Id.*]. Plaintiff also told Dr. Calhoun that she was taking intermittent walks and exercising in Florida daily and had lost ten pounds. [*Id.*]. Concerning home life, Plaintiff felt safe at home and was willing to make lifestyle changes and learn self-management skills. [*Id.*]. Lastly, Plaintiff did not find any barriers that would make it hard to lead a healthy lifestyle. [*Id.*]. The only obstacle that appeared in her way was her mental state, which remained hopeless and feeling "emotional[ly] upset and couldn't tolerate it." [*Id.*].

### (5) Dr. Frank J. Hamlett, M.D., The Meadows Psychiatric Center

Plaintiff admitted herself to The Meadows Psychiatric Center on September 3, 2018, after months of "an ongoing breakdown." [*Id.* at 315]. Dr. Hamlett, the attending physician of Meadows Psychiatric Center, oversaw Plaintiff. [*Id.*]. In addition to the ongoing breakdown, Plaintiff told Dr. Hamlett she suffered from crying spells and found herself "snapping out" on other people. [*Id.*]. She was "more irritable than she used to be" due to the anxiety of not getting any better and a perpetual feeling of helplessness. [*Id.*]. Plaintiff told Dr. Hamlett that she had suicidal thoughts of overdosing or shooting herself with a gun. [*Id.*]. Significantly, just one year before her admittance into The Meadows, she tried to drive her car into a tree but stopped herself before impact. [*Id.*]. After their discussion and mental status examination, Dr. Hamlet concluded that Plaintiff was cooperative and engaged but with slowed motor activity. [*Id.* at 317]. Plaintiff spoke softly with a flat affect. [*Id.*]. Dr. Hamlett noted Plaintiff displayed a clear and coherent thought process without delusional thoughts. [*Id.*] He recommended a seven to ten-day stay, but Plaintiff left in four days after passing the discharge criteria. [*Id.* at 320, 323].

### (6) Lori Greenblatt, LPC, Still Point Counseling Services, LLC

On September 12, 2018, four days after Plaintiff discharged herself from The Meadows Psychiatric Center, Greenblatt from Still Point Counseling Services conducted a psychiatric

evaluation on Plaintiff. [*Id.* at 323]. At that time, Plaintiff told Greenblatt about her depression and that she was amid a "breakdown." [*Id.* at 325]. Plaintiff also stated she stays in bed because she feels like she "has no purpose." [*Id.*]. Moreover, Greenblatt noted that Plaintiff and her husband had been married since 1982. [*Id.*]. At the beginning of marriage, the husband was physically abusive. [*Id.*]. Ultimately, Greenblatt recommended weekly outpatient therapy to help Plaintiff gain better coping skills that would reduce her depression and anxiety and improve her daily and interpersonal functioning. [*Id.* at 329].

### (7) Assessment of Policy Issues: Okyn Brenda, LMHC

Plaintiff's Licensed Mental Health Counselor, Ms. Okyn Brenda, assessed Plaintiff on January 23, 2019, and posited that Plaintiff suffers from "pain," "understanding and memory limitations," "sustained concentration and persistence limitations," "social interaction limitations," and "ability to adapt limitations." [*Id.* at 86]. She also wrote that Plaintiff was her patient since November 2018 and has major depressive disorder. [*Id.* at 376]. The number of symptoms that Plaintiff demonstrated to Ms. Brenda was "substantially in excess of that required to make this diagnosis." [*Id.*]. Plaintiff has one or more "medically determinable impairments" ("MDI"), which can be expected to produce her pain. [*Id.* at 26]. Despite this, Ms. Brenda's records ultimately concluded that Plaintiff was not disabled because "the evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim." [*Id.* at 100].

### (8) Dr. Dahlia V. Gordon, Psy.D.

The Office of Disability Determinations referred Plaintiff to Dr. Gordon for a general clinical evaluation with mental status assessment on March 1, 2019. [*Id.* at 379]. At the evaluation's onset, Dr. Gordon marked Plaintiff's attention and working memory as "fair." [*Id.* at 382]. Plaintiff could, for example, recall up to six digits forward and between four and five digits

8

backward. [*Id.*]. When Dr. Gordon asked Plaintiff to perform a mental tracking task involving subtraction by a series of sevens, Plaintiff could calculate the first of three sequences correctly. [*Id.*]. Plaintiff's verbal abstract reasoning skills were marked "fair." [*Id.*]. Furthermore, Plaintiff told Dr. Gordon that her biggest problem in life was "not knowing who I am, not knowing how to be happy." [*Id.*].

Dr. Gordon found Plaintiff's intellectual ability to be at least within the low average range. [*Id.*]. On the Rey Fifteen Item Memory Test, for example, Plaintiff could recall twelve of fifteen items, "which generally would not be suggestive of significant production or exaggeration of symptomology in order to achieve primary or secondary gains." [*Id.*]. Dr. Gordon noted Plaintiff's strained relationships with her husband often lead to arguments and took a toll on her mental health. [*Id.* at 379.]. Based on her findings, Dr. Gordon found that Plaintiff could independently handle her finances, but "may have intermittent limitations with concentration secondary to anxiety." [*Id.* at 383]. Additionally, "her tendency to become overwhelmed and experience panic attacks may lead to difficulty maintaining stable employment." [*Id.*]. However, Dr. Gordon also noted that Plaintiff demonstrated "fair" insight and judgment and encouraged Plaintiff to continue therapy, which could reduce the impact of her panic attacks. [*Id.* at 383].

In conclusion, Dr. Gordon recommended referral for medical services as needed, continuing psychotherapy as needed to address depression, anxiety, and unresolved emotional issues in conjunctions with relaxation training, marital counseling, and nutritional counseling. [*Id.*].

### (9) Mental Residual Functional Capacity: Bevlyn Sagon, PhD, LLC.

Dr. Sagon conducted a mental residual functional capacity assessment on Plaintiff on March 20, 2019. [*Id.* at 89]. Dr. Sagon wrote of Plaintiff's constraints in "sustained concentration

and persistence limitations," but also noted that she did not have limitations in understanding and remembering. [*Id.*]. For example, Plaintiff's ability to carry out "detailed instructions and maintain attention and concentration" for extended periods was moderately limited. [*Id.*]. While Dr. Sagon attested to Plaintiff 's severe symptoms, history of mental treatment, hospitalization, counseling, and psychotropic medication, he concluded "[Plaintiff] is nonetheless stable and should be capable of sustaining at least limited social demand settings based on past work history and current capabilities." [*Id.* at 90]. Dr. Sagon reasoned that Plaintiff could maintain an ordinary routine without special supervision, can work well with coworkers without distracting them, is cognizant of everyday hazards, and takes precautions. [*Id.*]. Plaintiff's work-related functions "were moderately limited," but not to an extent where her ability to complete a typical workday or workweek would be hampered by "interruptions from psychologically based symptoms" or require an unreasonable number and length of rest periods. [*Id.*].

### (10)   Dr. Stanford A. Williamson, D.O.

Dr. Williamson, a consultative examiner, conducted another physical examination on Plaintiff on April 10, 2019. [*Id.* at 391]. Dr. Williamson noted that Plaintiff was "tearful and distraught as a result of chronic pain." [*Id.* at 83]. She lacked range of motion in her upper and lower extremities. [*Id.*]. Upon examination, however, Dr. Williamson found that plaintiff was able to carry out simple tasks such as picking up a sheet of paper and transferring the sheet to each hand. [*Id.* at 391]. She could also hold a pen and sign her name. [*Id.*]. Dr. Williamson recorded her strength at a five out of five with normal grip strength and intact sensation. [*Id.* at 83]. Despite Plaintiff's statements about her chronic pain, she also stated that she could carry out the following activities independently: shopping, feeding, using public transportation, performing personal hygiene, cooking, managing funds, tying and untying shoelaces, and buttoning and unbuttoning

10

shirts and pants. [*Id.* at 391]. As a result, Dr. Williamson concluded that these various tasks provided Plaintiff the ability to perform certain physical activities and retained her residual functional capacity for future employment. [*Id.* at 29].

> **(11)    Physical Residual Functional Capacity: Steven Arkin, MD**

Plaintiff was observed by Dr. Arkin on April 12, 2019. [*Id.* at 88]. During the session, Dr. Arkin noted that an October 19, 2017 X-ray the plaintiff had done due to pain in the left foot showed no evidence of a fracture. [*Id.*]. Dr. Arkin found Plaintiff capable of functioning within the parameters of her RFC. [*Id.*]. He opined that although Plaintiff's pain allegations are "consistent" with the medical evidence, the RFC is considerate of symptoms and any reports provided by Plaintiff on file. [*Id.*].

No pending lab tests, radiology tests, procedures, surgeries, or recently pending medical records were available to Dr. Arkin at the time. [*Id.*]. Dr. Arkin wrote that Plaintiff's impairments "do not meet, or medically equal to," the severity requirements of any listed impairments. [*Id.*]. His reasoning is reflected in Plaintiff's ability to occasionally lift or carry up to fifty pounds, stand or walk for roughly six hours per eight-hour workday considering her fibromyalgia, could sometimes climb ladders, stairs, balance, and bend at the waist, kneel, crouch, and crawl despite postural limitations. [*Id.*].

That same day, Dr. Arkin also assessed whether Plaintiff held the ability to perform past relevant work. [*Id.* at 91.]. Dr. Arkin considered her past work as a service writer assistant, direct support professional, and dental assistant and agreed that Plaintiff has the RFC to perform past relevant work. [*Id.*]. Dr. Arkin reasoned Plaintiff still has a "medium work capability to demonstrate the maximum sustained work of the physical RFC." [*Id.*]. Plaintiff could still

lift/carry, stand, walk, sit, push, and pull, and therefore, still possess the needed requirements for her past work. [*Id.* at 92]. Therefore, Dr. Arkin did not find Plaintiff to be disabled. [*Id.* at 93].

### **HEARING TESTIMONY**

At the hearing held on January 2, 2020, before the ALJ, Plaintiff's counsel indicated the basis of their appeal was entitlement to SSI based on Plaintiff having impairments including depression, anxiety, fibromyalgia, osteoarthritis, hypothyroidism, sleep apnea, hypercholesterolemia, bursitis in her right hip, a herniated disc in the lower back, and post-traumatic stress disorder. [*Id.* at 43]. Plaintiff testified that she is a fifty-eight-year-old high-school graduate. [*Id.* at 49]. She travels between Pennsylvania, where her family lives, and Florida. [*Id.* at 39]. She currently lives in an RV in Florida and travels to Pennsylvania "as often as [she] can." [*Id.*]. Plaintiff is unemployed but has worked as a dental assistant, service writer, and direct service professional. [*Id.* at 46].

Plaintiff stopped working as a service provider, her most recent employment, at a truck repair facility in August 2017. [*Id.* at 51]. She alleged that she was being treated unfairly by her service manager, Bob. [*Id.*]. Despite doing "the best job [she] possibly [could]," there was an ongoing contentious relationship between herself and Bob. [*Id.*]. For example, the two had an argument about whether service for a truck was completed. [*Id.*]. The Plaintiff told the ALJ that during this disagreement, she responded to Bob, "I told you it wasn't ready. And [Bob] just said, 'you're killing me. You're killing me. This is terrible. You're killing me. You're letting me down.'" At which point Plaintiff began to cry. [*Id.*].

Plaintiff testified further that her primary care providers are in Pennsylvania, except for her therapist, Wanda Oaken, who practices in Pompano Beach, Florida. [*Id.* at 44]. Unfortunately, Dr. Oaken failed to release any medical records that could have helped the ALJ in her ultimate

decision. [*Id.* at 45–47]. Plaintiff then visited Dr. Ursiago at Holy Cross Medical, where she was diagnosed and treated for a "pinched neck" [*Id.* at 48]. Dr. Ursiago, likewise, did not release Plaintiff's medical records. [*Id.*]. Roughly eight months before this hearing, Plaintiff contended that she "was having a lot of pain breathing … [and] it was hurting [her] back and …chest." [*Id.* at 47].

Plaintiff testified that she suffers from deep depression. [*Id.* at 52]. Her depression included "a lot" of suicidal thoughts. [*Id.*]. Plaintiff stated, "several things happen (sic) to [her] as a child," that contributed to her PTSD though she did not elaborate on the events. [*Id.* at 52]. Plaintiff takes psychotropics—ten different medications prescribed by her primary care physician in Western Pennsylvania—to help remedy her mental condition and is working with a therapist to get "through a lot of this." [*Id.*].

Regarding physical ailments, Plaintiff stated she fell and injured her knee back in 2017. [*Id.* at 46]. Plaintiff was seeing an orthopedist to help treat her knee but is "not currently seeing him" after her insurance would not cover the doctor's physical therapy recommendations. [*Id.* at 46, 56]. Plaintiff continued to testify that her fibromyalgia has worsened significantly since her right meniscal tear in 2017. [*Id.* at 56]. Plaintiff stated that "[her] ankles don't bear the weight well anymore" and she cannot walk "very long anymore without pain." [*Id.* at 56]. She was seeing a rheumatologist to help alleviate the pain from fibromyalgia, and the doctor discovered "15 to 18 trigger points" that contributed to the constant pain. [*Id.* at 54]. The effects of fibromyalgia leave Plaintiff with "a lot of nerve issues … a lot of pain…. Any touching. Laying down. Sitting, standing, and walking." [*Id.* at 55]. Plaintiff is "able to move when [she] need[s] to move. Sit when [she] need[s] to sit. And [has] a horrible sleeping time because of the pressure from laying down." [*Id.*]. Additionally, Plaintiff went on to state that she receives injections for bursitis in her hip,

which "helped for a little bit." [*Id.*]. Since moving to Florida, Plaintiff feels slightly more active and stated the positive effects of short walks with her two dogs and swimming, which calms her bursitis. [*Id.* at 57].

Plaintiff told the ALJ she can do daily chores like "a little bit" of cleaning. [*Id.* at 57]. When her husband comes home for his lunch break, she will make him a sandwich. [*Id.*]. Plaintiff stated that grocery shopping is a painful experience. [*Id.* at 61]. "I feel it as soon as I get out of the vehicle first. It takes a little bit to loosen everything up. Then I'll—I can walk around for about 15 minutes, and then I start limping again, and the hips and everything starts getting more sore [sic]." [*Id.* at 56.] But Plaintiff also testified she could do light grocery shopping including use of the self-checkout line and carrying light bags. [*Id.* at 55]. Plaintiff's friend Patty often accompanies her during grocery shopping, and usually bags the groceries and loads the bags into the car. [*Id.* at 55]. Patty keeps Plaintiff "grounded" with daily activities and helps her control her temper – which she states is prone to outbursts. [*Id.* at 57].

Testimony by Vocational Expert Jeffrey Barrett

Before the hearing, vocational expert ("VE") Mr. Jeffery Barrett reviewed the vocational evidence in the record and gave testimony during Plaintiff's live hearing. [*Id.* at 60]. Mr. Barrett noted that Plaintiff had prior work experience as a dental assistant and worked in the truck service industry. [*Id.*]. Based on his review of the vocational evidence in the record and Plaintiff's testimony, as well as consideration of her impairments, he concluded there were jobs in the national economy for Plaintiff. [*Id.* at 66]. These included produce weigher and mail clerk, which involve sedentary work and account for Plaintiff's mental conditions. [*Id.* at 70]. The ALJ asked Mr. Barrett whether an individual within Plaintiff's age, education, and work experience who could also frequently climb stairs and occasionally climb ladders, ropes, and scaffolds could retain

Plaintiff 's previous jobs. [*Id.* at 68]. Mr. Barrett affirmed that two of the three jobs previously held by Plaintiff would remain: the dental hygienist and the service provider. [*Id.* at 69].

When asked, "if this individual was off task 15% of the workday, due to symptoms from fibromyalgia, as well as symptoms from mental health impairments, would this individual be able to maintain employment," Mr. Barrett concluded that "15% off task would be unacceptable to employers." [*Id.* at 66]. Plaintiff's counsel then cross-examined Mr. Barrett and asked if one could work as a marker or mail clerk if they were reduced to occasional stairs and only occasional use of the right upper extremity. [*Id.* at 67]. Mr. Barrett answered that this individual could still be a marker or mail clerk but not a produce weigher. [*Id.*]. Lastly, when asked if this individual could maintain employment if they were absent two days per month due to fibromyalgia and mental health decline, Mr. Barrett responded that an employer would consider this extended absence unreliable. [*Id.* 67–68].

## **RELEVANT LAW**

### Standard of Review

The claimant bears the burden of proving the existence of a disability. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). Federal courts reviewing a social security appeal are to employ "a deferential reconsideration of the findings of fact and [an] exacting examination of the conclusions of law." *Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("[t]he Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g)"). Substantial evidence does more than "merely create a suspicion of the existence of a fact." *Id.* Instead, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It is more than a scintilla

and must include relevant evidence that a reasonable person would accept as adequate to support the conclusion. *Williams*, 416 at 862.

A district court must respect the Commissioner's decision if supported by substantial evidence, even if the district judge would have reached a contrary result as a finder of fact or finds that the evidence preponderates against the Commissioner's decision. *See Kieser v. Barnhart*, 222 F. Supp. 2d 1298 (M.D. Fla. 2002). Consequently, the reviewing court is prohibited from reweighing evidence already considered by the ALJ. *See Mitchell v. Soc. Sec. Admi.*, *Comm'r*, 771 F.3d 780,782 (11th Cir. 2014). Despite this deferential standard, the Commissioner's conclusions of law are not afforded the same presumption of validity. *Williams*, 416 F. App'x at 862. Rather, the Commissioner's legal conclusions are reviewed *de novo*. *See Hargress v. Soc. Sec. Admin.*, *Comm'r*, 883 F.3d 1302, 1305 n.2 (11th Cir. 2018).

<u>Regulatory Framework</u>

The Social Security regulations provide a five-step "sequential" evaluation process that an ALJ can use to determine whether a claimant has established they are disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920. *See also Williams*, 416 F. App'x at 862.

An ALJ will end the inquiry whenever a claimant fails to prove one of the five steps and the analysis ceases at that moment. *See* 29 C.F.R. 416.920(a)(4). *See* 20 C.F.R. § 416.920(a)(4) The first step requires the ALJ to determine whether the claimant is engaged in "substantial gainful activity" ("SGA"). 20 C.F.R. § 416.920(a)(4)(i). If the claimant is engaged in SGA, they are not deemed disabled. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).

Step two requires the ALJ to evaluate whether a claimant's alleged impairments are "medically severe." 20 C.F.R. §416.920(a)(4)(ii). The ALJ must determine whether the impairments, "alone or in combination, 'significantly limit' the claimant's 'physical or mental

ability to do basic work skills.'" *See* Phillips, 357 F.3d at 1237 (quoting 20 C.F.R. § 404.1520(c)). "In other words, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Sanchez v. Soc. Sec. Admin.*, *Comm'r*, 507 F. App'x 855, 856 (11th Cir. 2013).

Once the ALJ establishes the first two elements, she may advance to the third step and decide if any of the claimant's proffered impairments, individually or in combination, "meet or equal" any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App.1. *Phillips*, 357 F.3d at 1237. Though the list of impairments is expansive, "the idea is that the listings 'streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background.'" *Id.* (quoting *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)). If so, the ALJ proceeds to the fourth step, assessment of residual functional capacity and past relevant work. *See Phillips*, 357 F.3d at 1237 (quoting 20 C.F.R. § 404.1520(c).)

Step four requires a two-part analysis. First, the ALJ must assess the claimant's "residual functional capacity" ("RFC"). RFC is defined as "the most [the claimant] can still do despite [their] limitations. *See* 20 C.F.R. § 404.1545(a). Second, based on the claimant's RFC, the ALJ must determine whether a claimant can return to any "past relevant work." *Id.* If it is established that a claimant can return to any of their past relevant work, the analysis is over, and the claimant will not be deemed disabled. See *Phillips*, 357 F.3d at 1238. In determining whether Phillips can return to her past relevant work, the ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. 20 C.F.R. § 404.1520(e). That is, the ALJ must determine if the claimant is limited to a particular work level. *Id.* at 1238.

Lastly, the fifth step ends the claimant's burden, and the ALJ determines whether, given a claimant's age, education, work experience, and RFC, the claimant can perform any work. *See Phillips*, 357 F.3d at 1238. This requires the ALJ to decide whether "other work is available in significant numbers in the national economy that the claimant has the ability to perform." *Id*. at 1239. There are two ways that the ALJ could determine whether the claimant can adjust to other work in the national economy. *Id.* The first is by applying the Medical-Vocational Guidelines, which, in short, "provide applicants with an alternate path to qualify for disability benefits when their impairments do not meet the requirements of the listed qualifying impairments." *Id.* (citing 20 C.F.R. pt. 404 subpt. P, app. 2). The other route is having a vocational expert testify and report their findings to the ALJ. *Id.* The ALJ will ask the vocational expert a series of hypothetical questions that will help determine whether someone with the limitations established by the first four parts of this series can secure employment in the national economy. *Id.* If it is determined that there are a significant number of jobs in the national economy that the claimant could work, they will not be deemed disabled. *Id.*

A judge is prohibited from giving specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative medical finding. *See* 20 C.F.R. § 416.920c(a). *See also Glasby v. Soc. Sec. Admin.*, *Comm'r*, No. 21-12093, 2022 WL 1214015, at *5–6 (11th Cir. Apr. 25, 2022) ("[f]or claims filed on or after March 27, 2017, new regulations apply to the consideration of medical opinions…. This new regulatory scheme no longer requires the ALJ to assign more weight to medical opinions from a claimant's treating source or to explain why good cause exists to disregard the treating source's opinion.").

Now, considering 20 C.F.R. § 404.1520c, an ALJ should "focus on the persuasiveness of medical opinions and prior administrative medical findings by looking at five factors: (1)

supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *See* 20 C.F.R. § 404.1520c(c)(1)—(5).” *Glasby*, 2022 WL 1214015, at *6. Supportability and consistency are “the most important factors” when considering the persuasiveness of a medical source’s opinions or prior administrative medical findings. *See* 20 C.F.R. § 416.920c. Supportability pertains to the relevant, objective medical evidence and supporting explanations presented. *Id.* Furthermore, “the more consistent a medical opinion… is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.” *Id.*

<u>Disability Onset Date</u>

To be eligible for disability insurance benefits, a claimant must demonstrate a disability on or before the last date on which he was insured. *Caces v. Soc. Sec. Admin.*, *Comm’r*, 560 F. App'x 936, 939 (11th Cir. 2014) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam)). “The plain language of SSR 83-20, 1983 SSR indicates that it is applicable only after there has been a finding of disability, and it is then necessary to determine when the disability began.” *Id*. at 939 (citing *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1224–25 (11th Cir. 2001). If an ALJ’s determination is based on “ample, unambiguous medical evidence from both before and after the date last insured,” there is no error on their behalf. *Id.* See *also Overton v. Colvin*, No. 5:14-CV-00350-JEO, 2015 WL 3407529, at *7 (N.D. Ala. May 27, 2015) (“[t]hus, the salient issue is not whether substantial evidence supports the ALJ's finding that [plaintiff] was not disabled prior to June 14, 2011, but whether there is substantial evidence supporting her finding that [she] was not disabled at any time through June 30, 2010.”).

## **DISCUSSION**

Plaintiff contends the ALJ erred on one ground: failing to apply the correct legal standards

to Dr. Gordon's opinion and therefore finding a disability date prior to May 2, 2019. [ECF No. 18

at 1]. However, that is unjustified. The ALJ thoroughly reviewed Plaintiff's medical history and at

Step 5 of the five-factor analysis concluded as follows:

> After careful consideration of the entire record, the undersigned finds that since
> August 31, 2017, the claimant has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can
> frequently climb ramps and stairs. She can occasionally climb ladders, ropes and
> scaffolds. The claimant can occasionally balance, stoop, kneel, crouch and crawl.
> She can perform simple, routine, repetitive tasks for two-hour segments over the
> course of an 8-hour workday. She can respond appropriately to occasional changes
> in the work setting and is best suited to jobs that do not require interactions with
> the public. The claimant can have occasional interactions with coworkers and
> supervisors. In making this finding, the undersigned considered all symptoms and
> the extent to which these symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence, based on the requirements of
> 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned has also
> considered the medical opinion(s) and prior administrative medical finding(s) in
> accordance with the requirements of 20 CFR 404.1520c and 416.920c. [ECF No.
> 12 at 25–26].

The ALJ then reviewed in detail the medical records of the physical and mental health

providers. With respect to Dr. Gordon's examination, the ALJ considered supportability, and

consistency in determining that Dr. Gordon's medical source opinion was persuasive. [*Id.* at 25–

26]. Regarding supportability, the ALJ found that Dr. Gordon's opinion was persuasive because it

was based on "direct observations and clinical findings." [*Id.* at 33.]. Dr. Gordon reported that

Plaintiff "is able to feed, dress and bathe herself; she also reportedly knows how to travel alone,

drive, count money, manage her finances, and use of the stove. Although the claimant reported a

history of suicidal thoughts as well as a tendency to become overwhelmed, she denied having any

history of manic behaviors or impulsivity." [*Id.* at 30.].

Dr. Gordon's assessment of Plaintiff supports the ALJ's conclusion that Plaintiff has an "above residual functional capacity assessment, which is supported by the totality of the longitudinal objective medical record, which shows the claimant was able to perform her activities of daily living with minimal difficulty before the established onset date." [*Id.* at 33]. Defendant is correct that the ALJ noted Dr. Gordon's opinion was "consistent with Plaintiff's own reported daily activities." [ECF No. 20 at 9].

For instance, the ALJ properly found Dr. Gordon's observations to be consistent with Plaintiff's self-reported activities such as using the stove, ability to bathe and dress herself, and manage her finances. [ECF No. 12 at 30, 33]. Plaintiff self-reported she can calm her anxiety with medication, which she reduced to twice a week to help curb panic attacks. [*Id.*] Also of note, Plaintiff did not "start therapy until September 2018 with no history of mental health services before that time." [*Id.*]

This can be compared to Dr. Gordon's observation that, although Plaintiff had some difficulty with a serial sevens test, she appeared to have fair attention and working memory and could carry out a three-step verbal command. [*Id.*]. The ALJ did recognize that Dr. Gordon's medical records stated that "it was possible [her] motivation during the evaluation might be limited by her emotional status and by true emotional distress…[and] her tendency to become overwhelmed and experience panic attacks may lead to difficulty maintaining stable employment." [*Id.* at 31]. Defendant is also correct that Plaintiff's ability to perform "simple, routine, [and] repetitive" tasks coincide with Dr. Gordon's equivocal opinion. [ECF No. 20 at 1]. Dr. Gordon noted Plaintiff's symptoms and history but did not go further than to state that these factors "may" have intermittent limitations in concentration or difficulty finding stable employment. [ECF No. 20 at 1]; *see also* [ECF No. 12 at 383].

The ALJ ultimately reached the conclusion that a pre-2019 onset date would be improper based on Dr. Gordon's persuasive record. Indeed, the ALJ noted:

> The undersigned finds the opinion of Dr. Gordon persuasive because it is internally consistent with her direct observations and clinical findings of the claimant documented contemporaneously at the time of her examination discussed in detail above. Dr. Gordon 's opinion is also consistent with the claimant's reported ability to perform her activities of daily living that Dr. Gordon documented during her clinical interview.

[*Id.* at 33].

Moreover, the ALJ pointed out the medical reports in the record that supported a finding that Plaintiff's physical pain and psychiatric symptomatology worsened beginning May 2, 2019. [*Id.* at 31–32]. Thus, based on the ALJ's review of the record and the in-person hearing, there is substantial evidence in the record to conclude that Plaintiff was disabled on the proper onset date of May 2, 2019. Accordingly, given the highly deferential substantial evidence standard and the prohibition against this Court reweighing the record evidence, the ALJ's decision should be affirmed.

## CONCLUSION

Because the ALJ's decision is supported by substantial evidence and is based on proper legal standards, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment [ECF No. 18] be **DENIED**, the Commissioner's Motion for Summary Judgment [ECF No. 20] be **GRANTED**, and the ALJ's decision be **AFFIRMED**.

Objections to this Report may be filed with the district judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." *11th*

*Cir. R. 301*; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28 U.S.C. §636(b)(1)(C).

**DONE AND ORDERED** in Chambers at Miami, Florida this 18th day of November 2022.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:      **All Counsel of Record via CM/ECF**